* * * * * * * * * * *
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS *Page 2 
1. Plaintiff filed an affidavit alleging that he was injured due to the negligent actions of State employees Roderick Suggs, Raymond Pearson, Officer McDaniel (Daniels), Marion McNeill, Mildred Prado and "John Doe, a person whose name is not now known to claimant." The State employees were allegedly negligent in allowing a fellow inmate to attack and stab plaintiff, resulting in stab wounds, scars, and pain and suffering.
2. The following were entered into evidence at the hearing before the Deputy Commissioner:
 a. Plaintiff's Exhibit 1: Transcript of video deposition of Dr. Alan H. Brader
 b. Plaintiff's Exhibit 2: Tape of video deposition of Dr. Brader
 c. Plaintiff's Exhibit 3: Nine photographs of plaintiff's scarring
 d. Plaintiff's Exhibit 4: N.C. Gen. Stat. § 8-46
Mortality tables
 e. Plaintiff's Exhibit 5: Plaintiff's sketch of cell block
 f. Plaintiff's Exhibit 6: Incident report dated February 21, 2000
 g. Plaintiff's Exhibit 7: Defendant's Responses to plaintiff's Requests for Admission
 h. Plaintiff's Exhibit 8: Memo dated March 18, 2000 from Wellman to McCabe
 i. Plaintiff's Exhibit 9: Investigating officer's report dated February 28, 2000
 j. Plaintiff's Exhibit 10: Injury reports
 k. Plaintiff's Exhibit 11: Leroy Hough witness statement dated February 21, 2000 *Page 3 
 l. Plaintiff's Exhibit 12: Plaintiff's witness statement dated February 24, 2000
 m. Plaintiff's Exhibit 13: Kenneth Daniels witness statement dated March 7, 2000
 n. Plaintiff's Exhibit 14: Photocopy of shank
 o. Plaintiff's Exhibit 15: Gary Dube witness statement dated February 21, 2000
 p. Plaintiff's Exhibit 16: C.J. McLeod witness statement dated February 21, 2000
 q. Plaintiff's Exhibit 17: M.G. McNeill witness statement dated March 8, 2000
 r. Plaintiff's Exhibit 18: Raymond Pearson witness statement dated February 21, 2000
 s. Plaintiff's Exhibit 19: Mildred Prado witness statement dated February 21, 2000
 t. Plaintiff's Exhibit 20: Wimverzack Redd witness statement dated March 8, 2000
 u. Plaintiff's Exhibit 21: R.A. Suggs witness statement dated February 21, 2000
 v. Plaintiff's Exhibit 22: Wellman's sketch of door lock mechanism
 w. Plaintiff's Exhibit 23: Wellman's sketch of control booth
 x. Defendant's Exhibit 1: Investigation materials *Page 4 
3. The issues before the Full Commission are whether defendant had a duty to protect plaintiff from Inmate Hough, whether defendant's officers breached that duty, whether plaintiff was contributorily negligent, whether defendant's breach of the alleged duty caused plaintiff's injuries, and, if so, what damages plaintiff is entitled to receive.
 * * * * * * * * * * *
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. In February 2000, plaintiff was incarcerated and in the custody of defendant at Central Prison, where he was assigned to work as a janitor in the prison hospital.
2. On February 17, 2000, Sgt. D. Lawrence, an officer with defendant who was also plaintiff's work supervisor, asked plaintiff if he knew anything about drugs being smuggled into Central Prison. Plaintiff told Sgt. Lawrence that another inmate, Leroy Hough, was involved in drug-smuggling.
3. Later that day, Inmate Hough came to the prison hospital to pick up a delivery of drugs that had been smuggled into the prison. Inmate Hough was immediately searched by Sgt. Lawrence, who found a quarter-ounce of marijuana on Inmate Hough. Sgt. Lawrence placed Inmate Hough in a holding cell in the hospital area. While Inmate Hough was in the holding cell and within the sight and hearing of Sgt. Lawrence, Inmate Hough shouted at plaintiff, "I know you snitched, and I'm gonna f — you up." Sgt. Lawrence told plaintiff not to worry about Inmate Hough's threats because Inmate Hough would be placed in disciplinary segregation, also called "lockdown" or "the hole," where he would not come in contact with plaintiff. *Page 5 
4. Knowing that Inmate Hough would be put in lockdown for at least 30 days, plaintiff did not worry about Inmate Hough's threat, because plaintiff was scheduled to be released from prison in 27 days.
5. As of February 17, 2000, plaintiff was housed on the second floor of the WRB building in H-Block, Cell HL-209.
6. Inmate Hough was initially placed in disciplinary segregation in a location other than the WRB building, but he was soon moved to the first floor of the WRB building in G-Block, Cell CL-105, which is a close-custody confinement area. Inmate Hough was to be confined to his cell for 23 hours out of every day and removed from his cell only in the company of a correctional officer for recreation time and showering. Inmate Hough was to be kept isolated from other inmates on the cell block. Once each hour, a correctional officer was to check on Inmate Hough and to make sure that his cell door was securely locked.
7. In the control booth of Cell Block G, a monitor panel indicated whether the cell doors in the block were securely locked. When a cell door was properly locked, a green light appeared on the monitor, and when a cell door was open or not properly locked, a red light appeared. The correctional officer assigned to the control booth monitored the lights. All lights should have been green after 11:00 p.m.
8. On February 20, 2000, while housed in disciplinary segregation, Inmate Hough was able to purchase half of a pair of haircutting scissors from another inmate and made a prison shank by wrapping tape around the handle.
9. Over a four-day period leading up to February 21, 2000, Inmate Hough gradually defeated the locking mechanism on his cell door by stuffing cigarette rolling papers into it so that the deadbolt could not slide into the door when it was closed. On February 21, 2000, the control *Page 6 
booth monitor panel light for Inmate Hough's cell was working properly and showed a red light for Inmate Hough's cell door, as shown by Officer Redd's examination of the cell door immediately after the assault.
10. On February 21, 2000 at about 4:00 p.m., Inmate Hough was let out of his cell for recreation and shower time. He was returned to his cell at approximately 5:10 p.m. by Correctional Officer Kenneth Daniels, and his cell door was closed.
11. With the deadbolt on his cell door now fully defeated by the wadded-up rolling papers, Inmate Hough used a playing card to undo the latch on the cell door, and, at about 5:45 p.m., opened his cell door and left his cell carrying the shank. Inmate Hough walked past a guard station, with the light for his cell door showing red, and left Cell Block G through two doors that were supposed to be controlled by correctional officers. At this time, Correctional Officers Daniels and Ronderic Suggs, and Sgt. Marion McNeill were the officers assigned to Cell Block G.
12. Inmates confined to disciplinary segregation are not supposed to be able to get out of their cells and walk out of the cell block without supervision by correctional officers. Cell Block G, being a disciplinary segregation area, was supposed to be monitored by officers even more closely than other cell blocks. The guard station had glass windows in order to allow the officers to see inside the cell block at all times.
13. After he walked out of Cell Block G, Inmate Hough pulled a hat down over his eyes to hide his face and went through a lobby monitored by correctional officers. Inmate Hough waited with other inmates to enter an elevator on the first floor of the WRB building. The elevator was controlled by correctional officers, who had the ability to monitor who was getting on and off the elevator. A correctional officer opened the elevator door, and Inmate *Page 7 
Hough entered the elevator with other inmates. Inmate Hough rode the elevator to the second floor and exited the elevator. He then walked into Cell Block H, still with the shank, through doors that were controlled by correctional officers, even though inmates from one cell block are not supposed to be allowed to enter a different cell block.
14. Around 6:30 p.m., plaintiff returned to his cell after taking a shower. As he did so, Inmate Hough entered plaintiff's cell and stabbed him with the shank, which had a three-inch-long blade. Inmate Hough stabbed plaintiff twice on the right side of his abdomen and once each on his left hand, left arm and left shoulder.
15. Plaintiff cried out for help as he attempted to fend off Inmate Hough's attack. Correctional Officers Dube and McLeod, who had been conducting searches of nearby cells, responded, and Inmate Hough fled the scene. Shortly thereafter, Inmate Hough was apprehended and admitted attacking and stabbing plaintiff. Immediately after the attack, Correctional Officer Redd went to Hough's cell and confirmed that, although Inmate Hough's cell door was shut, the light on the monitor panel for Inmate Hough's cell door showed red. There was no indication the lights were malfunctioning in that unit.
16. Plaintiff was carried on a stretcher to the prison hospital where he was taken by ambulance to Wake Medical Center. At WakeMed, plaintiff immediately underwent an emergency exploratory laparatomy with Dr. Alan Brader, a board-certified trauma surgeon. Dr. Brader opened plaintiff's abdomen with a long vertical cut that extended from below plaintiff's navel up his chest. Dr. Brader found that one of the abdominal stabbings penetrated through three layers of muscle into plaintiff's peritoneum, or the inner cavity of the abdomen where the internal organs reside. Dr. Brader found two punctures in plaintiff's small intestine and closed them with staples. He then flushed out the cavity and closed the surgical cut and the stab *Page 8 
wounds with stitches. Plaintiff's left arm and shoulder wounds were also stitched closed. The shoulder wound was rather deep. Plaintiff's left hand wound was a puncture wound through his entire hand and did not require stitches but was dressed. Dr. Brader testified that if plaintiff's wounds had been left untreated, plaintiff could have developed an infection, which may have been life threatening.
17. Plaintiff remained at WakeMed for seven days and was discharged on February 28, 2000. He was placed on a morphine pump in the hospital for pain and was prescribed Percocet for pain upon his release from WakeMed and continuing until he was released from prison several weeks later. For one month, plaintiff was placed on a 25-pound lifting restriction because of his abdominal injuries.
18. As the result of the assault, plaintiff has a large permanent surgical scar running vertically from below his navel up his chest, about 10 inches in length, with stitch marks running along both sides. Plaintiff has a scar approximately one inch in length where he was stabbed on the right side of his abdomen. He has a scar about two inches in length on his left shoulder and a scar about three inches in length on his left bicep. Finally, plaintiff has a puncture-type scar on the palm of his left hand and a corresponding scar on the back of his left hand where he was stabbed all the way through the hand.
19. According to Dr. Brader, plaintiff also has permanent scar tissue in his abdomen, caused by the stabbing and the surgery, which may cause plaintiff future problems such as bowel blockages.
20. Now an Associate Warden for Operations at Central Prison, Ronald Wellman testified that at the time of the incident on February 21, 2000, he was an Internal Affairs Correctional Captain and conducted an investigation into the assault on plaintiff. Officer *Page 9 
Wellman explained that the building plaintiff and Inmate Hough were housed in contains 192 cells, with two cell blocks on each of three floors, 32 cells in each block, and has six to eight inmates within a cell block on administrative segregation. Officer Wellman testified that if an inmate is on administrative segregation, he should not be able to walk out of his cell and walk freely out of the cell block. He testified that Inmate Hough was only supposed to exit his cell if it was unlocked by a correctional officer who would then escort him out of his cell. Officer Wellman explained that the administrative segregation unit where Inmate Hough was housed also contained regular population inmates, who were free to roam in portions of the cell block; however, Inmate Hough would only have been allowed out of his cell for a one-hour recreation period when the regular population was isolated.
21. Officer Wellman explained that the officer in the control room in Inmate Hough's cell block was responsible for monitoring 192 lights on the control panel, opening and closing cell doors, monitoring inmates in the canteen, allowing entry and exit to another building, and monitoring a hallway and elevators. In order for an inmate to gain access to the elevator, a correctional officer would have to depress a button to open the elevator doors. The lobby area in between the two cell blocks is also monitored by correctional officers, but the officer failed to observe Inmate Hough in that area before he got on the elevator. As the result of his investigation, Mr. Wellman concluded that none of defendant's employees violated any department policy or failed to perform their jobs as required.
22. As of the date of the Deputy Commissioner's hearing, plaintiff was 43 years old and had a life expectancy of 35.6 years.
23. The Commission finds that plaintiff sustained significant damages from the trauma of being attacked and stabbed by a fellow inmate, pain and suffering, hospitalization for *Page 10 
one week, significant scarring and the possibility of future medical complications from bowel blockages.
24. Defendant had knowledge that Inmate Hough specifically threatened plaintiff. Therefore, the Commission finds that it was reasonably foreseeable to defendant's correctional officers that Hough would attack plaintiff if given the opportunity. Plaintiff's injuries were proximately caused by the negligence of Correctional Officers Daniels and Suggs and Sgt. McNeill in the performance of their duties. Defendant's employees failed to adequately supervise the inmates and allowed Inmate Hough to leave his cellblock and enter plaintiff's cellblock, and then to seriously injure plaintiff.
25. Plaintiff has incurred the following out-of-pocket expenses, advanced by his counsel, in his prosecution of this action, relating to the deposition of Dr. Brader: $200.00 for Legal Media Services, $196.90 for Scott Court Reporting, and $600.00 for Carolina Surgical Associates, for a total of $996.90.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. N.C. Gen. Stat. § 143-291(a) confers the North Carolina Industrial Commission with jurisdiction to hear tort claims against the State Board of Education, the Board of Transportation, and all other departments, institutions and agencies of the State. Id.
2. Under the provisions of the Tort Claims Act, negligence is determined by the same rules applicable to private parties. Bolkhir v.N.C. State Univ., 321 N.C. 706, 709, 365 S.E.2d 898, 900 (1988). *Page 11 
3. The North Carolina Department of Correction had a duty of reasonable care to protect plaintiff from reasonably foreseeable harm. Failure to do so constitutes negligence. Taylor v. N.C. Dept. ofCorrection, 88 N.C. App. 446, 363 S.E.2d 868 (1988). Prison officials are liable when they have knowledge of, or in the exercise of reasonable care should have anticipated, danger to a prisoner and fail to take appropriate precautions to safeguard prisoners. Williams v. Adams,288 N.C. 501, 504, 219 S.E.2d 198, 200 (1975).
4. Defendant's correctional officers Daniels, Suggs, and McNeill had a duty to use reasonable care to protect plaintiff from Inmate Hough since Inmate Hough had specifically threatened to retaliate against plaintiff for reporting Hough to authorities. Taylor v. N.C. Dept. ofCorrection, supra.
5. Defendant's correctional officers breached their duty to protect plaintiff by failing to prevent Inmate Hough from defeating the locking mechanism on his cell door and failing to notice that the cell door was not locking properly; by failing to prevent Inmate Hough from leaving his cell and his cell block; and by failing to prevent Inmate Hough from using the elevator to reach the second floor. This failure of the correctional officers to prevent Inmate Hough from entering plaintiff's cell block allowed Inmate Hough to attack plaintiff. N.C. Gen. Stat. § 143-291. As a direct result of this negligence, plaintiff was assaulted and sustained an injury with long-term effects. Williams v.Adams, supra.
6. Based on defendant's knowledge that Inmate Hough had specifically threatened plaintiff, it was reasonably foreseeable to defendant's correctional officers that Inmate Hough would attack plaintiff if given the opportunity. Plaintiff was seriously injured by Inmate Hough's attack, and plaintiff's injuries were the direct and proximate result of defendant's *Page 12 
correctional officers' multiple breaches of their duty to protect plaintiff. N.C. Gen. Stat. § 143-291.
7. Plaintiff was not contributorily negligent. N.C. Gen. Stat. § 143-291.
8. Plaintiff sustained damages as a direct and proximate result of defendant's officers' negligence, including the trauma of being attacked and stabbed by a fellow inmate, pain and suffering, hospitalization for one week, significant scarring and the possibility of future medical complications from bowel blockages. N.C. Gen. Stat. § 143-291.
9. Given the nature and extent of plaintiff's injuries, as well as plaintiff's need for future medical treatment, $50,000.00 is a reasonable sum for plaintiff's loss. N.C. Gen. Stat. § 143-291. Defendant should also reimburse plaintiff for his costs incurred in prosecuting this action.
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 ORDER
1. Defendant shall pay plaintiff the sum of $50,000.00, as monetary damages for the injuries he sustained on February 21, 2000.
2. Defendant shall pay plaintiff's costs. As part of these costs, defendant shall reimburse plaintiff's counsel in the amount of $996.90 in out-of-pocket expenses he incurred in the prosecution of this action.
This 5th day of August, 2008. *Page 13 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/___________________ DIANNE C. SELLERS COMMISSIONER *Page 1